IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AMY R. MAEZ,

    Plaintiff,

vs.                                          Civil No. 09cv1176 RLP

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

### Memorandum Opinion and Order

Plaintiff, Amy R. Maez, ("Plaintiff" herein), appeals from the final decision of the Commissioner of the Social Security Administration denying her applications for Disability Income Benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Plaintiff moves this court to reverse and remand this matter for rehearing. (Docket No. 15).

For the reasons stated herein, Plaintiff's Motion to Reverse and Remand is granted.

**I.**    **Procedural History**

Plaintiff filed applications for DIB and SSI on February 27, 2007, alleging onset of disability as of July 14, 2006 due to anxiety, fatigue, attention deficit hyperactivity disorder, insomnia, depression, uterine bleeding and mania. (Tr. 151, 115, 50, 123). The claims were denied initially and on reconsideration. (Tr. 50-53). Plaintiff requested a hearing before an administrative law judge, which was conducted on April 8, 2009. (Tr. 18-48). The ALJ issued a decision denying Plaintiff's claims on August 17, 2009. (Tr. 5-17). The Appeals Council denied Plaintiff's request for review on November 10, 2009. (Tr. 1-3). The ALJ's August 17, 2009 decision is now before the court as the final decision of the Commissioner.

While the ALJ's decision denying benefits was pending before the Appeals Council,

Plaintiff reapplied for SSI benefits.[1] Plaintiff appended to her Motion to Reverse and Remand the first page of a "Notice of Award" dated March 16, 2010, stating that she was found disabled as of October 2, 2009, approximately six weeks after disability denial at issue in this appeal. The portion of the award letter before the court does not state the reasons for this disability determination. (Docket No. 15, Ex. B).

## II.  Background Facts

### A.  Vocational Factors.

Plaintiff was born on January 24, 1977. (Tr. 115). She completed two years of college and obtained a license as a certified nursing assistant. (Tr. 157). She has job experience as a CNA, nursing assistant, and medicaid administrator. (Tr. 152).

### B.  Evidence from Treating/Examining Physicians.

Plaintiff has a history of treatment for bleeding problems following a miscarriage, irregular menstrual bleeding[2], and treatment for psychological problems.

On August 7, 2006, Plaintiff sought medical care and was assessed as anxious and depressed with compulsive behaviors. Xanax and Paxil were prescribed. (Tr. 228-229). By January 2007 she complained of long term depression, anxiety, stress, fatigue, self-destructive behaviors, insomnia and drug abuse[3] in response to abusive relationships . (Tr. 581). A clinical review check list prepared by care providers at the New Mexico Behavioral Health Institute - Community Based Services ("CBS" herein) described her as depressed, irritable, labile, anxious, sad, with obsessive

---

[1] Plaintiff was last insured for DIB as of September 30, 2010 (Tr. 147). She has submitted no documentation that she filed a new application for DIB as well.

[2] See, e.g., Tr. 227, 228, 233, 237-238, 151, 154, 237, 291, 260, 317-320.

[3] The record indicates that Plaintiff's illicit drug use ended in approximately April 2007. (Tr. 407, 10).

2

thought content, organized and rational thought processes, normal speech, intact memory, good insight, fair judgment, appropriate appearance, and oriented x 4. (Tr. 578-579).

Plaintiff began counseling through CBS in February 2007. On February 19, 2007 Brenda White, M.D obtained a detailed history from Plaintiff, conducted a brief mental status exam,[4] and diagnosed Attention Deficit Hyperactive Disorder r/o Bipolar II Disorder[5] and polysubstance abuse, with a GAF of 50[6]. Dr. White prescribed Strattera for ADHD, encouraged abstinence from drug use and referred Plaintiff to Bob Ray, LPCC, for psychotherapy. (Tr. 242-245, 265). On March 13, 2007 Dr. White submitted a form to the Income Support Division of the New Mexico Department of Humans Services ("DHS" herein), stating that Plaintiff had become disabled as of July 2006, and could expect to be disabled for a minimum of 12 months. (Tr. 256). In support of this opinion, the form sets out the diagnoses of ADHD r/o Bipolar; Major Depressive Disorder II and Generalized Anxiety Disorder, and "client reports verbally explosive outbursts, agitation, withdrawn." (Tr. 256). Plaintiff was seen in an emergency room briefly on March 8, 2007. The nature of her complaints at that time are unclear. She was given Xanax, having apparently run out of that

---

[4] Dr. White assessed Plaintiff as mildly anxious, with mild dysfunction in insight, judgment, attention/concentration and impulse control. (Tr. 244).

[5] "Bipolar disorder" is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. The DSM (Diagnostic and Statistical Manual of Mental Disorders) specifies the commonly observed patterns of bipolar I and bipolar II disorder and cyclothymia." Stedman's Medical Dictionary, at 568 (28th ed.2000).

[6] "The Global Assessment of Functioning (GAF) is a subjective determination based on a scale of 1-100 of 'the clinician's judgment of the individual's overall level of functioning.' " Salazar v. Barnhart, 468 F.3d 615, 624 (10th Cir.2006) (quoting Diagnostic and Statistical Manual of Mental Disorders, 34  (4th Ed. 2000)) ("DSM-!V" herein).  A GAF score between 41 and 50 indicates " '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, inability to keep a job).' " Lee v. Barnhart, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir.2004) (quoting DSM-IV 34)

medication two weeks before, and released. (Tr. 322-326).

On March 22, 2007 Mr. Ray met with Plaintiff for a second time, noting that she was more stable, with fewer ADHD symptoms, but continued having problems sleeping. (Tr. 263).

On April 2, 2007, Plaintiff saw Dr. White for medication management. She reported dizziness with periods of increased anxiety and sleep, followed by periods of increased energy, anxiety, irritability and obsessive compulsive behaviors. Dr. White continued to suspect bi-polar disorder as well as ADHD. She decreased the dosage of Strattera, and prescribed Diazepam for sleep and a trial of a mood stabilizer, Topamax. (Tr. 257).

In March/April 2007 Plaintiff's treatment team at CBS prepared another clinical review checklist. (Tr. 267-276). Her mental status assessment remained unchanged from February, and she was diagnosed as suffering from Major Depressive Disorder, Recurrent, moderate and Polysubstance dependence. The form further stated that she could take care of her daily needs, but suffered from anxiety and insomnia.

Plaintiff suffered a partial miscarriage in May 2007 (Tr. 285, 301-316), and for a time stopped taking Stattera or seeing Dr. White. (Tr. 292). When she returned to Dr. White on July 2, she was described as depressed, tearful, anxious and isolating. Dr. White restarted Strattera and Diazepam , and increased the dosage of the mood stabilizer Topamax. (Tr. 371). Later that month Dr. White submitted a second report to the DHS, stating that Plaintiff had been temporarily disabled since February 19, 2007, and that this condition would continue for six months from that date. No explanation, beyond the diagnoses of Bipolar II disorder, depression, and ADHD-combined type, was given. (Tr. 370).

Plaintiff returned to Dr. White on August 27, 2007, complaining of continued mood swings and decreased sleep. Dr. White assessed her as hypomanic with mildly pressured speech and a

decreased need for sleep. Dr. White prescribed an additional mood stabilizer, Lamictal. (Tr. 372).

Plaintiff began seeing Linda Kennedy, PhD, for psychological therapy on September 13, 2007, following the retirement of Mr. Ray. She reported continued insomnia, variable sleep patterns and obsessive-compulsive behaviors. Dr. Kennedy stated that Plaintiff had stabilized medically, and "may be able to focus on the subject matter of therapy." (Tr. 373). Dr. Kennedy then wrote a letter on Plaintiff's behalf seeking an extension of General Assistance benefits. The letter states in material part:

> Since her admission to CBS, she has been treated for Attention-Deficit-Hyperactivity Disorder, Combined Type (314.01), and she is currently being evaluated to determine if she is experiencing Bipolar II Disorder or Posttraumatic Stress Disorder (as a result of experiencing severe domestic violence in the past) due to her irritability and frequent mood swings.
>
> (She) has been working with our CBS psychiatrist, Dr. White, since her admission to stabilize her symptoms. Currently she is receiving a mood stabilizer, Topomax (sic), to assist in reducing her abrupt swings from depression to anger and irritability; Strattera to address ADHD and improve her ability to focus and concentrate; and diazepam to reduce anxiety and insomnia.
>
> The combination of symptoms that Ms. Maes is experiencing tends to be very debilitating. Her anger and anxiety are easily triggered by stress and stimulation in the environment. Further, she recently experienced a tubal pregnancy and related surgery that complicates her health status. Because of Ms. Maes' insomnia, resulting fatigue, chronic anxiety and withdrawal from stimulation, a return to employment is unlikely at this time and further treatment is indicated.

(Tr. 365).

Dr. Kennedy and Dr. White both saw Plaintiff in October 2007. Plaintiff complained to Dr. Kennedy that Lamictal was not effective, and that she felt she was cycling into a manic/hyperactive phase. Dr. Kennedy noted that her mood was anxious, affect was congruent, speech was talkative and thoughts were linear. (Tr. 374). Dr. White also noted Plaintiff's complaints of increasing manic symptoms (hyperactivity, insomnia, racing thoughts, talking too much), and diagnosed "mixed state

with depression, irritability, and anxiety...insomnia/hypersomnia." She discontinued Topamax due to "increased memory problems," increased Lamictal and Diazepam, and continued Strattera. (Tr. 375).

Plaintiff's applications were denied at the second level of administrative review on November 20, 2007. (Tr. 52-53, 64-69).

Plaintiff returned to Dr. White on January 7, 2008, stating that she was doing "so-so," and complaining of increased depression and anxiety, increased sleeping, and side effects from the anti-depressant drugs Abilify (tingling in legs) and Seroquel (sedation). Dr. White adjusted her medications and scheduled her for a return visit in four weeks. (Tr. 403).

On her return visit on February 18, 2008, Plaintiff complained of insomnia, lack of motivation and mood swings. Dr. White again adjusted her medications and scheduled a neuropsychological examination to clarify the diagnosis. (Tr. 416). Dr. Kennedy evaluated Plaintiff on February 25, 2008, noting some improvement, but continued paranoia and obsessive compulsive behaviors. (Tr. 414). The following month Debra Rodda L.S.M.W replaced Dr. Kennedy as Plaintiff's therapist. (Tr. 408). At a therapy session on April 7, 2008, Plaintiff reported that she had difficulty paying attention and "needed a quiet place to work," describing psychological testing she had completed that day. (See Tr. 432). Ms. Rodda indicated that Plaintiff had to be redirected at times to stay on topic, and was somewhat "tangential" in her thought processes, had difficulty maintaining eye contact, but reported some success in managing anxiety and depression symptoms. (Tr. 407).

Neuropsychologist Gerald L. Russell, PhD, prepared a report dated April 11, 2008, documenting his evaluation of Plaintiff. He noted that she "may" not have put forth maximum effort on one of the several tests he administered. Dr. Russell reported that Plaintiff suffered from bipolar

disorder, PTSD, panic disorder with agoraphobia, and ADHD. He assessed her current GAF as 58.[7] (Tr. 432-434).

Dr. White saw Plaintiff for the last time on April 15, 2008. She noted Plaintiff's complaints, adjusted her medications, and referred her to Jasmin Breitung, M.D., for continued psychiatric care. (Tr. 496).

Dr. Breitung, who is an internist and psychiatrist, saw Plaintiff on June 25, 2008. She was unable to conduct a psychological intake exam due to insurance issues, but did conduct a physical examination, take a history and renewed Plaintiff's medications. (Tr. 442-444).

By July 2008 Plaintiff's case worker indicated that she was doing well and had minimal needs. (Tr. 470-471, 474). She missed several appointments with Ms. Rodda in July and August 2008 (Tr. 524, 452-453) and when seen by Ms. Rodda on August 12, 2008, discussed numerous problems: difficulty obtaining psychiatric medications, inability to see a CBS psychiatrist until October; difficulty focusing on tasks; anger and explosiveness; inability to sit still in cars; poor attention; anxiety with agoraphobia. Six days later, a Beck's Depression Inventory was completed, indicating that Plaintiff was suffering severe depression. (Tr. 528-529). On August 27, 2008, Ms. Rodda again noted Plaintiff's difficulties coping with explosive, violent anger and stress. (Tr. 533).

Throughout 2008 Plaintiff became unreliable with regard to attending scheduled counseling and case management appointments. (Tr. 479, 482, 524, 452-453, 454, 527, 530, 545, 553-554). At times this was attributed to illness, increased need for sleep, or dissatisfaction with CBS. Other times no reason was stated.

---

[7] The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." DSM-IV at 32. A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." Id. at 34; Wilson v. Astrue, 602 F.3d 1136, 1142 fn. 3 (10th Cir. 2010).

Dr. Breitung saw Plaintiff for a psychiatric evaluation on December 11, 2008.  (Tr. 558-564).  She took a detailed history[8] and conducted a mental status examination which was normal except for an anxious affect. (Tr. 561).  Dr. Breitung reached the following multi-axial diagnosis:

| | |
|---|---|
| Axis I: | 1.  Bipolar disorder, recurrent,  currently depressed but rapid cycles with several manic episodes per yr |
| | 2.  Panic disorder or in context of #1 |
| | 3.  Polysubstance dependence in remission |
| Axis II: | Deferred |
| Axis III: | Headache, irregular menses |
| Axis IV: | mild |
| Axis V: | 60 |

On January 14, 2009 Plaintiff told Dr. Breitung that she had been through a hypomanic phase, followed by three days of sleeping, and that she needed additional Xanax.  Dr. Breitung described Plaintiff as anxious and easily distracted.  She diagnosed bipolar disorder with anxiety, and increased the dosages of  Xanax and Lamictal. (Tr. 557).   Dr. Breitung wrote a letter on Plaintiff's behalf on February 16, 2009. The letter set out her psychiatric diagnoses[9] of Bipolar type I, recurrent frequently mixed state, recently depressed and panic disorder, and stated that Plaintiff "is not able to work due to the above conditions, especially her psychiatric problems result in inability to concentrate, focus and work effectingly (sic)." (Tr 594).  A hand written addendum to this letter, dated April 7, 2009 stated that Plaintiff "has had many ER visits in the past 2 years for anxiety and depression, about 7 in last 2 years.  She also has polysubstance dependence in complete remission, since two years.  She has been very compliant with the treatment plan." (Tr. 595).  On

---

[8]The history documented complaints of irritation, anger, violence, claustrophobia, panic attacks, past drug use, poor attention span, compulsive behaviors, familial violence, job history and difficulties, medical history and current living situation.

[9]Dr. Breitung also included migraine headaches, allergic rhinitis and back pain in her list of diagnoses. (Tr. 594).

April 27, 2009, after Plaintiff's hearing before the ALJ, Dr. Breitung submitted a letter describing functional limitations caused by bipolar disorder:

> She has been previously diagnosed by Dr. White and subsequently by my self with Bipolar disorder.
>
> I have also diagnosed her with panic disorder, but this occurs in the context of bipolar disorder, and polysubstance dependence disorder, remission.
>
> Amy has frequent manic and hypormanic (sic) phases, about every two-four months. During this she is hyperactive, is unable to sleep adequately and has a reduced need for sleep. At first she is functional and able to do tasks such as clean the house from top to bottom but the longer the manic phase the more confused and disorganized she becomes, and finally she develops paranoid delusions. She then after three or five days of mania crashes into a depressive state during which she sleeps excessively for the next several days and is not functional. In between these severe phases, Amy is very anxious and tends to be irritable, has anger bursts and has difficulty paying attention and focusing. She is essentially not able to work to date, even when she feels better due to the above.
>
> The above manic and depressive phases have occurred without the use of drugs and alcohol. She has especially been sober since about two years.
>
> Amy was a hard working individual in the past. If she ever becomes more functional and capable of working I have not doubt that she will do so. I believe that Amy should be on psychiatric disability.
>
> She follows up with me regularly and has been compliant with my treatment plan.

(Tr. 599-600).

### C. Evidence of Non-Examining Physician

Psychiatrist Jill Blacharsh, M.D., an agency physician, evaluated Plaintiff's mental health records in November 2007. (Tr. 447, 378-395). The ALJ did not refer to or discuss Dr. Blarcharsh's evaluation. He stated generally that he had "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96.2p, 96.5, 96.6p and 96-3." (Tr. 14). Based on her review of the medical record as of November 16, 2007, Dr. Blacharch assessed

moderate limitations in eleven areas of functioning [10] and concluded:

> She is able to tend to her personal care, do chores, cook, shop, manage money. She needs prompting with medications and appointments. She needs assistance with driving. . . she is isolated although she does attend church, can be irritable and angry, has difficulty with those in authority. She has difficulty managing stress and change.
>
> From a psych perspective, claimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work setting.

(Tr. 380).

## III.  **ALJ's Decision**

The ALJ found that Plaintiff had severe impairments of substance abuse (in reported remission), ADHD, an affective disorder[11] and migraine headaches (Tr. 10), non-severe impairment of a history of miscarriages, and that these severe and nonsevere impairments did not meet or equal a listed impairment. (Tr. 12). He found that she had the residual functional capacity ("RFC" herein) to perform the full range of work at all exertional levels provided that such work was limited to unskilled work consisting of simple tasks, working primarily with things rather than people in a low-stress environment, defined as requiring only routine changes and occasional independent decision

---

[10] Abilities to : understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform as a consistent pace without an unreasonable number and length of rest periods interact appropriately with the general pubic; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others. (Tr. 378-379).

[11] In his numbered findings, the ALJ did not specify the type of affective disorder. In the body of his decision, the ALJ stated that Dr. White had diagnosed r/o bipolar II disorder ; Dr. Russell had diagnosed bipolar disorder, most recent episode unspecified and panic disorder with agoraphobia (Tr. 12); and that Plaintiff has been diagnosed with possible bipolar disorder. (Tr. 15)

10

making. (Tr. 13). In reaching the RFC evaluation, the ALJ considered and discounted Plaintiff's credibility. (Tr. 14-16). The ALJ determined that Plaintiff could not perform her past work. Utilizing the testimony of a vocation expert, the ALJ found that Plaintiff retained the RFC for other work that exists in significant numbers in the national economy. (Tr. 16-17). Accordingly, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act. (Tr. 17).

## **IV.**     **Legal Standard**

Because the Appeals Council denied review of the ALJ's decision, the Commissioner's final decision for purposes of this appeal is that of the ALJ. **Doyal v. Barnhart**, 331 F.3d 758, 759 (10th Cir.2003). Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. **See Poppa v. Astrue**, 569 F.3d 1167, 1169 (10th Cir.2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Doyal v. Barnhart**, 331 F.3d at 760 (quotation omitted). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. **Branum v. Barnhart**, 385 F.3d 1268, 1270 (10th Cir.2004). The court "meticulously examine[s] the record as a whole, including anything that may undercut or detract from the [administrative law judge's] findings in order to determine if the substantiality test has been met." **Wall v. Astrue**, 561 F.3d 1048, 1052 (10th Cir.2009) (citations omitted). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. **See Bowman v. Astrue**, 511 F.3d 1270, 1272 (10th Cir.2008) (quotations and citations omitted).

**V.     Issues on Appeal**

Plaintiff raises several issues. I address two in this opinion:

A.     Whether the award of benefits on Plaintiff's subsequent application is new and relevant evidence  mandating remand of this action.

B.     Whether the ALJ failed to apply correct legal principles in evaluating the opinions of treating physicians White, Kennedy and Breitung.

**VI.    Discussion**

**A.     Whether the Granting of Benefits based on a Subsequent Application Warrants a Remand.**

The Plaintiff argues that the subsequent award of SSI benefits warrants a remand.  She provides no indication of what evidence was presented to the Commissioner with respect to her subsequent application.

Several courts have found that a grant of benefits on a subsequent application for benefits with an onset date in close proximity to the first application may constitute new and material evidence warranting remand. See, **Hayes v. Astrue**, 488 F.Supp.2d 560, 565 (W.D.Va.2007) ("[W]here a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding of a disability may constitute new and material evidence."); **Luna v. Astrue**, 2008 WL 2559400 at *2 (D.Ariz., June 23, 2008) ("Where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding may constitute new and material evidence."); **Reichard v. Barnhart**, 285 F.Supp.2d 728, 734 (S.D.W.Va.2003) (holding that the Commissioner's subsequent finding of disability, which commences less than a week later than when the claimant was found to be not disabled, was new

and material evidence); **Graham v. McMahon**, 2007 WL 2021893 at *2 (W.D.Va., July 6, 2007); but see, **Allen v. Commissioner of Social Security**, 561 F.3d 646, 654 (6th Cir.2009) (remand is not warranted on the basis of subsequent grant of benefits, by itself, since the subsequent grant of benefits may be based upon a new age classification, a worsening of the claimant's condition, or some other change); **Bruton v. Massanari**, 268 F.3d 824, 827 (9th Cir.2001) (finding that award of benefits under subsequent application was not new evidence warranting remand where different medical evidence, different time period, and different age classification were involved);

 Here, the subsequent decision granting benefits is not in the record. The evidentiary basis upon which the Commissioner based that decision is unknown. In view of the lack of a reliable showing before me, I cannot say that the subsequent award of benefits is, in and of itself, grounds for remand. Plaintiff has not articulated, nor is it apparent, whether the decision awarding Plaintiff benefits would undermine the decision presently before me, since it may actually relate to a deterioration in her condition, or to some other intervening cause. To the extent Plaintiff seeks a remand based upon a subsequent grant of benefits, I am unable to find that the grant constitutes new and material evidence. Simply stated, temporal proximity is insufficient. The law requires evidence, not mere proximity, to be the critical factor in this analysis.

  **B.** **Evaluation of Treating Source Opinions**

 The opinion of a treating source is generally entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. §§ 404.1527(d)(2) and §416.927(d)(2). Even if a treating source opinion is not given controlling weight, it is still entitled to deference "and must be weighed using all of the factors provided in 20 C.F.R. §§404.1527 and

416.927."[12] Social Security Ruling 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996). Whether given controlling weight or not, a treating source opinion may not be rejected absent good cause, and the ALJ must give specific, legitimate reasons, clearly articulated in the hearing decision, for rejecting a treating source opinion. **Goatcher v. United States Department of Health & Human Services**, 52 F.3d 288, 290 (10th Cir.1995); **Frey v. Bowen**, 816 F.2d 508, 513 (10th Cir.1987). An ALJ may reject a medical source opinion "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." **McGoffin v. Barnhart**, 288 F.3d 1248, 1252 (10th Cir.2002) (citation and internal quotations marks omitted).

The determination of whether a claimant is disabled is reserved to the Commissioner, and opinions of treating sources on this issue are given no special significance or controlling weight. 20 C.F.R. §§ 404.1527(e) (2 & 3), 416.927(e)(2 & 3); SSR 96-5p, West's Soc. Sec. Reporting Serv. 123-24 (Supp.2004); SSR 96-8p, West's Soc. Sec. Reporting Serv. 150, n. 8 (Supp.2004). Such opinions, however, must not be ignored and will be evaluated in accordance with the regulatory factors. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp.2004). The ALJ's decision "must explain the consideration given to the treating source's opinion(s)" concerning issues reserved to the Commissioner. SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 127 (Supp.2004).

    1)    Dr. White

Dr. White saw Plaintiff on nine occasions over a fourteen month period. The ALJ discussed

---

[12]These factors include: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1119 (10th Cir.2004), quoting <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1300 (10th Cir.2003).

the history and reported symptoms Plaintiff disclosed to Dr. White,  Dr. White's diagnoses, GAF assessment, treatment and medication management. (Tr. 11).  The ALJ did not mention Dr. White's March and July, 2007 letters stating her opinion that Plaintiff was disabled, nor did the ALJ state what consideration, if any, was given to those opinions.

The ALJ erred in failing to evaluate Dr. White's opinion.  Because the ALJ did not address Dr. White opinions, or indicate what consideration he gave to those opinions, it is impossible for this court to determine if any consideration was given to those opinions.  This is key, given the fact that the opinions of all treating physicians regarding Plaintiff's ability to work are consistent, a factor which should not be ignored.  Application of correct legal principles requires that the ALJ explain what consideration he gave Dr. White's opinion.

        2)      Dr. Kennedy

Dr. Kennedy saw Plaintiff three times over a five month period.  The ALJ  referred to Dr. Kennedy's September 13, 2007 letter to the New Mexico Income Support Division, in which she stated that Plaintiff's symptoms of insomnia, fatigue, chronic anxiety and withdrawal from stimulation made a to return to employment unlikely at that time.   (Tr. 15).  This opinion was based on Dr. Kennedy's  initial session with Plaintiff, and her review of Dr. White's treatment records. (Tr. 16).  The ALJ "granted no additional weight" to  Dr. Kennedy's  opinion because she "noted no specific functional limitations."  (Tr. 15-16).

The decision not to give Dr. Kennedy's controlling weight for the sole stated reason that she did not assign specific functional limitations was in error. Dr. Kennedy was not required to assign specific functional limitations before her opinion could be given  controlling weight. Instead, an ALJ is "required to give controlling weight to a treating physician's opinion about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis and any physical or

15

mental restrictions, if 'it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.' " **Bean v. Chater**, 77 F.3d 1210, 1214 (10th Cir.1995) (quotation omitted). Dr. Kennedy's opinion regarding the impact of Plaintiff's insomnia, fatigue, chronic anxiety and withdrawal from stimulation is consistent with the diagnoses and opinions of all treating and examining physicians, e.g., is well supported by clinical and diagnostic techniques, and it not inconsistent with other substantial evidence of record.

        3)      Dr. Breitung

Dr. Breitung treated Plaintiff on five occasions over an eight month period. The ALJ discussed Dr. Breitung's April 27, 2009 letter in which the functional aspects of Plaintiff's psychiatric illness were explained in detail. The ALJ rejected Dr. Breitung's opinion on the sole ground that it was not consistent with her opinion of *two months before*. (Tr. 15)

On December 11, 2008, *four months before*, Dr. Breitung described the numerous psychiatric/emotional symptoms of which Plaintiff complained, indicating that on the day of examination the primary sign was anxiety. She diagnosed recurrent bipolar disorder with rapid cycling between depression and mania and associated panic disorder, assigning GAF of 60 (Tr. 558, 561, 563). On January 14, 2009, *three months before*, Dr. Breitung described a worsened condition, stating that Plaintiff was anxious and easily distracted. She diagnosed bipolar disorder with anxiety and increased the dosages of Xanax and Lamictal. (Tr. 557). On February 16, 2009, *two months before*, Dr. Breitung wrote a letter stating Plaintiff was unable work because her psychiatric illness caused an inability to concentrate, focus and work "effectingly" (sic). (Tr. 594).

The ALJ's stated reason for rejecting Dr. Breitung's detailed functional evaluation of April 27, 2008 is not supported by substantial evidence or the application of correct legal principles. An ALJ may not pick and choose from a medical report, using only those parts favorable to his decision.

**Robinson v. Barnhart**, 366 F.3d 1078, 1083 (10th Cir.2004). Nor may he "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." **Hardman v. Barnhart**, 362 F.3d 676, 681 (10th Cir.2004). "The ALJ may not pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability." **Hamlin v. Barnhart**, 365 F.3d 1208, 1219 (10th Cir. 2004).

The ALJ's errors in the evaluation of the opinions of Plaintiff's treating physicians impact all further findings made by the ALJ.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse **GRANTED** and the matter is Remanded to the Commissioner for additional proceedings.

_____
Richard L. Puglisi
Chief United States Magistrate Judge
(Sitting by Designation)